REID, Judge.
This is a damage suit brought by Ernest Gisclair, Jr., individually and on behalf of his minor son, Terry Gisclair, against the Security Insurance Company of New Haven and Clinton H. Eserman for $20,-000.00 for injuries to Terry Gisclair and $5000.00 special damages to Ernest Gisclair Jr., as a result of an automobile accident which happened on April 1, 1961 at approximately 9 :00 A.M. at a place located about 3.3 miles north of the Gallino Bridge and about 3.3 miles south of the Cote Blanche Bridge on Louisiana Highway No. 1 in the Parish of Lafourche
Terry Gisclair, minor son of Ernest Gis-clair Jr., was crossing Louisiana Highway 1 from the gate of his home in a diagonal direction to a spot on the east side of Louisiana Highway 1 on the bank of Bayou Lafourche where his grandfather, Cleveland Lerille, was standing by a telephone post.
Plaintiff alleges defendant Clinton H. Eserman was operating a 1956 Chevrolet Fordor in a negligent, reckless and careless manner in that he failed to maintain a proper and careful lookout, failed to have sufficient control over his vehicle, failed to see what he should have seen, was traveling at an excessive rate of speed under the conditions then and there existing, failed to observe children playing in the area and to take precautions commensurate with the circumstances and driving in a reckless and careless manner. Security Insurance Company of New Plaven was the liability insurer of the car owned by Clinton H. Eserman. Eserman was traveling north on said Louisiana Highway 1. The home of Ernest Gisclair Jr. was located on the west side of said Highway facing the Highway and the Bayou.
Defendant answered, denying any negligence on the part of Eserman and in the alternative pleading contributory negligence of the minor boy, Terry Gisclair, who was nine years old at the time of the accident, said negligent act being that he ran from the side of the Highway directly in the path of the Eserman car, ran across the Highway without looking, and in spite of a warning given him by his brother that cars were approaching, and failing to see the approaching vehicle and take precautions to avoid running directly into the path of the Eserman car.
The matter was tried and the Lower Court for written reasons rendered judgment in favor of plaintiff Ernest Gisclair Jr. in the sum of $1467.50 with legal interest from judicial demand, and in favor of Ernest Gisclair Jr. for and on behalf of his minor son, Terry Gisclair in the sum of $7500.00, together with legal interest from date of judicial demand and costs and taxed the fee of an expert witness, Dr. Byron Unkauf, in the sum of $150.00 as cost. The judgment was against both defendants in-sólido and from this judgment the defendants have brought this appeal.
The Trial Judge in his written reasons held that Terry Gisclair was guilty of negligence in crossing the Plighway in the path of oncoming traffic but held that the defendant had the last clear chance to avoid the accident.
Defendant-appellant contended that the Trial Judge committed manifest error when he concluded (1) that plaintiff was in a position of peril of which he was unaware and that he had his back to the approaching Eserman vehicle and did not look when he crossed the Highway; (2) that plaintiff did *485 not have the last clear chance to avoid the accident, and (3) that Terry Gisclair was running at a speed of merely 4 or 5 miles an hour and that it took him 6 seconds to run from the gate to the point of the collision and that defendant Eserman was not negligent in not seeing Terry Gisclair in time to avoid the accident.
Appellant alternatively and even assuming the Trial Judge’s findings were correct in holding, or in part, urged there is no room for application for doctrine of last clear chance under the facts of this case.
The issues involved in this case are mainly factual and there is very little difference in the facts.
It is elementary that there are three elements necessary to support the doctrine of last clear chance, namely (1) that the plaintiff was in a position of peril of which he was unaware, or from which he was unable to extricate himself; (2) that the defendant actually discovered, or was in a position where he should have discovered, plaintiff’s peril; (3) at the time defendant could have, with the exercise of reasonable car, avoided the accident. See Ballard v. Piehler, La.App., 98 So.2d 273; Phares v. Biggs, La.App., 135 So.2d 507.
The facts show conclusively that Terry Gisclair was playing with his seven year old brother Regan Gisclair in the yard of his home just before the accident. Terry noticed his grandfather Cleveland Lerille standing across the Highway on the west bank of Bayou Lafourche and darted out of the gate to go see his grandfather. Regan, following, started to cross the Highway also but seeing a car coming stopped at the Highway. Mr. Lerille was standing by a telephone post which later proved according to testimony of Ernest Gisclair Jr. to be 15 steps or 45 feet in the northeast direction from the Gisclair gate, or about 10 steps or 30 feet north of a point directly across the Highway from the gate. He was running at an angle with his back to the approaching Eserman car. Mr. Lerille was from his position able to see both the car approaching and his grandson crossing the Highway. He stated that he did not have time to yell a warning to his grandson before the crash happened. He said that Eserman’s car was about 200 to 210 feet from the point of collision when he first saw it, and the boy coming out of the gate.
Eserman stated that his eyesight was not good and he wore glasses, although he did not have them on at the time. There was nothing between him and the boy to prevent him from seeing him had he been looking and he testified positively that he did not see young Gisclair until he was two or three feet from the car and he could not avoid the accident. The child was thrown up on the hood of the car, Eserman turning right in an attempt to avoid hitting him shook the boy off into the Highway. Terry Gisclair received the following injuries: simple fracture of the left femur, compound fracture of right tibia, and fibula, cerebral contusion, bi-lateral abducens, nerve palsy, contusion of the right kidney and contusions of the face as a result of this accident. He was hospitalized and open reduction was applied with internal fixation of his fractures followed by a double spica, which is a complete body cast covering one side, down the other.
We feel the Trial Court clearly analyzed the facts in his written opinion a part of which we quote herewith:
“The Court feels and finds as a fact that the plaintiff was in a position of peril of which he was unaware and from which he was unable to extricate himself.
“The record shows in the testimony of Terry Gisclair, at page 82 of the transcript, that he proceeded to his left when he came out of the gate. This is corroborated by the only witness who saw the boy, his grandfather Cleveland Lerille, in his testimony, pages 24, 25, and 37, along with his exhibit, P-13. With the boy proceeding at an angle to *486 his left, it is impossible for him to see the approach of the car to his right. The boy is proceeding in such a position that he is looking up the bayou. The record shows in the boy’s testimony, as well as the testimony of Cleveland Lerille at page 19 of the transcript, that the boy didn’t stop.
“Certainly one proceeding with his back to vehicular traffic as was the case here, it was most certain, and this Court finds as a fact, that the plaintiff was in a position of peril of which he was unaware, and consequently being unaware, he was unable to extricate himself therefrom.
“The record further shows that the defendant failed to blow his horn or give any notice or warning to the boy which would assist him to become aware of his peril.
“The next question that must be answered is whether or not the defendant actually discovered or was in a position where he should have discovered the plaintiff’s peril.
“The question can be answered by analyzing the testimony in light of the pictures, particularly plaintiff exhibit S. The house from which Terry departed, and the gate, are shown clearly in plaintiff exhibit 5. This picture is taken 313 feet south or below the Gis-clair gate from which Terry departed. This is the view that Mr. Eserman had since the record shows that the shoulder and the area was the same at the time the pictures were taken, which was three weeks after the accident, as it was at the time of the accident. Mr. Eserman, had he been maintaining a proper lookout, was in a position most certainly, and the Court finds as a fact, were he should have discovered the plaintiff’s peril. As you look at plaintiff exhibit S, the defendant should have seen and is responsible for not seeing a nine year old boy proceeding at an angle.
“The Court is now confronted with the problem as to whether or not the defendant, with the exercise of reasonable care, could have avoided this accident.
“Mr. Eserman, as pointed out previously, was traveling 39 or 40 miles an hour. Forty miles per hour in Blash-field’s Cyclopedia of Automobile Law and Practice, is 58.4 feet per second. Therefore, based upon Mr. Eserman’s estimate of speed, he was traveling 58 feet per second or less. With the defendant in the same position as the camera as shown in plaintiff’s exhibit 5, he was approximately 5 Y2 seconds from there to the point of impact.
“The Court, after having observed at page 90 of the transcript, the small boy moving in a similar manner as he was at the time of this accident, described same as a fast trot as compared to a run. Both movements were demonstrated to the Court by the boy, and the Court is of the opinion, not only from a demonstration, but from the testimony of Cleveland Lerille where he has testified at Tr. page 29, that the boy was running slow. This is also according to the testimony of the boy himself.
“The Court is of the opinion and finds as a fact that the rate of speed that the boy was proceeding, as the Court has described as a fast trot, is approximately four to five miles an hour. Using the maximum speed at five miles an hour, the boy was traveling at the rate of 7.3 feet a second. Mr. Lerille, at page 22 of the transcript, has testified that it took the boy six or seven seconds from the time he left the gate until the moment of impact. The distance that the boy traveled from the gate to the center of the highway is shown to be 45 feet. Of course, he crossed the center of the highway and traveled a few feet into the other lane, consequently traveling a greater distance than 45 feet. However, at 7.3 *487 feet per second the hoy would have taken slightly more than six seconds to get from the gate to the center of the highway. This is in accord with the testimony of Cleveland Lerille at page 22 of the transcript.
“As Mr. Lerille was at the position of the camera, in P-S Terry Gisclair was approximately 40 feet from the center of the highway. Blashfield’s Cyclopedia of Automobile Law and Practice shows that one traveling at 40 miles per hour has a total braking distance, including reaction time, of 205 feet. Of course, Mr. Eserman has testified that he was going slightly less than 40 miles an hour, reducing the reaction time.
“While the law does not require split second reaction one must have a clear chance. Based upon these figures, and assuming that Mr. Eserman was at the position of the camera in P-5, in addition to the total braking and reaction time, he had an additional 108 feet. This means that at the rate of speed both were traveling, Mr. Eserman could have traveled from the spot where the camera is located in P-5, an additional 108 feet and then began his reaction time and braking, and would have come to a complete stop before the accident. In our case Mr. Eserman did nothing. In fact, he failed to see the boy until he struck him.
“The Court finds as a fact that Mr. Eserman, with the exercise of reasonable care, could have avoided this accident. This is quite clear to the Court, particularly in the light of the fact that if Mr. Eserman had been in the identical position of the camera in P-5, he could have traveled for approximately two seconds, or a distance of 108 feet before he began any effort to bring his vehicle to a stop, and taking into consideration his reaction time and braking distance, he could have brought his vehicle to a complete stop before this accident.
“At the time he was traveling, the small boy was in a perilous position with his back to the vehicle, attempting to cross over the road to join his grandfather on the opposite side. Not only did the defendant fail to see the boy, but he failed to see his brother who was also running along the shoulder but stopped before entering the paved portion of the road.
“The jurisprudence of our state further allows and requires one, upon observing small children playing in the area, to be prepared to take necessary action, because the actions of small children are unpredictable. Plowever, in this case, the action of Terry Gis-clair was quite predictable from the moment he left the gate until he was hit. Pie was attempting to join his grandfather and had his back or shoulder to the oncoming defendant vehicle.
“Noted counsel for the defendant has quoted at length and cited the case of Phares vs. Biggs, 135 So.2d 507. That case is readily distinguishable from our case at hand. In the Phares case the accident occurred late in the evening at a time described by the Court as “dusk dark”, when visibility is low and vehicle headlights are least effective in illuminating the roadway. In our case it was broad daylight, with clear visibility.
“Further, in the Phares case the Court could not ascertain the exact point of impact and the definite direction taken by the little girl in attempting to cross the highway. These facts have been readily ascertained in our case.”
This brings us to the question of quantum. The appellant does not contest the award for special damages in favor of *488 the father, individually but claims that the award to the hoy should be reduced from $7500.00 to $5000.00 for his pain and suffering. The .facts show that Terry was in a complete body cast, immobolized from the time of the accident on April 1, 1961 until May of 1961, and according to Dr. George the attending physician, the injuries were “very painful and prolonged illness”, additionally Terry had bleeding, swelling and abrasions over the entire right side of his face and right side of his head. In addition to the fact that he was hospitalized for about 14 days he was confined to the house for approximately 8 months and was required to be readmitted to the hospital for four days more than 14 months after the accident for the surgical removal of plates and screws in his right leg.
In addition to the serious and painful injuries Dr. Unkauf testified that he was faced with a permanent disability of 5 to 10% of the knee as a result of severe damages to the knee joint. Dr. Unkauf testified further that the present pain in the leg which was more than two years after the accident and after a hard day’s playing would be likely but should diminish.
The findings of the Judge of the Lower Court, while not necessarily binding on this Court, are strongly persuasive and will be sustained unless proved manifestly erroneous and that the Judge had abused his discretion in the matter. We feel that the award of $7500.00 was adequate and not excessive and see no reason to disturb the award given by the District Judge.
For the foregoing reason it is ordered that the judgment of the Lower Court be affirmed.
Affirmed.